IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JEANNE EBERLY

    Plaintiff,

v.

PDS MERGER SUB, INC., doing business as, PDS, and PERSONNEL DATA SYSTEMS

    Defendant.

No.

JURY TRIAL DEMANDED

# COMPLAINT

Plaintiff Jeanne Eberly files this Complaint against Defendant PDS Merger Sub, Inc., doing business as PDS, and Personnel Data Systems, and in support thereof avers as follows:

## JURISDICTION AND VENUE

1. This Court has original jurisdiction over Counts I and II of this Complaint pursuant to 28 U. S. C. §1331, in that these claims are based upon laws of the United States of America, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) ("Title VII"); and the Americans with Disabilities Act, 42 U.S.C. §12101, as amended by the ADA Amendments Act of 2008 ("ADA"). This Court has supplemental jurisdiction over Count III for breach of contract, which arises under the common law of the Commonwealth of Pennsylvania, and Count IV, violation of the Pennsylvania Wage Payment Collection Law, 43 Pa C. S. §260.1 ("WPCL"), a Pennsylvania statute.

2. Venue is appropriate in this Court pursuant to 28 U. S. C. §1392(b) in that Defendant has ongoing business operations in this District, Plaintiff was employed in this District, and a substantial part of the events giving rise to the claim occurred in this District.

1

3. The amount in controversy exceeds $150,000.00, exclusive of interest and costs.

4. Plaintiff has complied with the applicable administrative remedies by timely filing a Charge with the Equal Employment Opportunity Commission ("EEOC") on February 13, 2026, Charge no. 530-2026-03747, and simultaneously dual filing a Complaint with the Pennsylvania Human Relations Commission ("PHRC"), Case no. unknown.

5. On February 25, 2026, the EEOC issued a Dismissal and Notice of Suit Rights, permitting Plaintiff to file her Title VII and ADA claims in this Complaint.

6. Plaintiff intends to file an Amended Complaint to assert causes of action for sex and disability discrimination under the Pennsylvania Human Relations Act, 43 P. S. §955(a) ("PHRA") upon receipt of applicable authority from the PHRC. As the primary decision-maker who participated in, directed, and/or aided and abetted the discriminatory practices alleged herein, Steven Fitzgerald, Executive Vice President of Defendant, is personally liable for the PHRA claims and will be added as a Defendant in the Amended Complaint.

## **PARTIES**

7. Plaintiff Jeanne Eberly ("Eberly") is an adult individual who resides at 902 Kriebel Road, Eagleville, PA 19403.

8. Defendant PDS Merger Sub, Inc., doing business as PDS, and Personnel Data Systems, is a Delaware corporation that operates a principal place of business at Blue Bell Executive Campus, 470 Norristown Road, #202, Blue Bell, PA 19422.

9. At all times relevant hereto, Defendant was acting through its agents, servants and employees, who were acting within the scope of their authority in the course of their employment and under the direct control of Defendant.

## FACTUAL BACKGROUND

### *Eberly's Employment with PDS*

10. Eberly is a 57 year-old female.

11. In 1997, Eberly commenced employment with Personal Data Systems, Inc.

12. Eberly left Personal Data Systems, Inc. in February 2001; she was re-hired in May 2002.

13. Eberly was employed by Personal Data Systems, Inc. and its successor entity for a combined total of more than 28 years.

14. Personal Data Systems, Inc. was originally owned by Steven Brody and after his passing in May 2001, the majority owner was Patricia Palmer ("Palmer").

15. As of July 1, 2024, Palmer sold Personal Data Systems, Inc. to Steven Fitzgerald ("Fitzgerald") who became the owner and CEO.

16. On June 1, 2025, Personal Data Systems, Inc. was sold to Univerus, a global software company headquartered in Burnaby, British Columbia, Canada, with over 360 employees and 3,500 clients worldwide.

17. The company that was known as, Personal Data Systems, Inc., now operates as PDS Merger Sub, Inc., a newly formed corporation that is a wholly owned subsidiary of Univerus, that continues to operate the business as, PDS and Personnel Data Systems (hereinafter, the company is collectively referred to as, "PDS").

18. Following the sale, Fitzgerald became Executive Vice President of PDS.

19. PDS provides a human capital management ("HCM") system that includes core human resources, payroll, benefits, recruiting, on-boarding, time and attendance, self-service, workflow, analytics, and extensive reporting components in a single software database solution.

20. PDS has approximately 65 employees.

21. Prior to Univerus's acquisition of PDS, Univerus collaborated with PDS in joint sales efforts for approximately two years.

22. Eberly was integral in establishing and cultivating the Univerus partnership and successfully closed multiple deals jointly involving the Univerus SAP financial solution and Unity platform.

23. In 2025, Eberly's total gross earnings were $251,203.23, plus employment benefits.

24. As of 2025, Eberly was the top-revenue generator for PDS.

### *Eberly's Duties as Director of Sales*

25. Until August 16, 2025, in her capacity as Director of Sales, Eberly was responsible for selling the PDS Vista software solution across the United States and Caribbean, managing the PDS sales team covering the United States, Canada, and the Caribbean territories, and responsible for client account management for Cayman Islands clients.

26. Until August 16, 2025, five members of the PDS sales team reported to Eberly: Dan Price, Regional Sales Manager; Greg Cross, Regional Sales Manager; Alexander Moskovitz, Executive Relations Manager; Darrell Vandergrifft, Manager of Solution Specialists (collectively, the "Male Sales Team Members"); and Claudia Kuneck, Senior Sales Development Representative.

27. Prior to Universus's acquisition of PDS, Greg Cross was employed in the PDS Marketing Department as a Video Specialist.

28. Immediately following Univerus's acquisition of PDS in June 2025, Executive Vice President Fitzgerald transferred Cross to the sales team despite him having no prior PDS or HCM sales experience.

29. While serving as Director of Sales with managerial responsibility, Eberly was responsible for supervising and formally evaluating the performance of the Male Sales Team Members.

### *Regional Sales Manager Price*

30. From 2017 through the termination of Eberly's employment, Eberly's annual sales performance consistently and substantially exceeded that of Regional Sales Manager Price.

31. PDS has a performance review process, that requires evaluation of an employee's performance and written notice of deficient performance.

32. In both 2023 and 2024, Price demonstrated deficient sales performance.

33. As required by the PDS performance review process, Price received a written warning indicating that he failed to meet established expectations and sales goals and that immediate improvement was required.

### *Eberly's Health and Need for Time Off*

34. In February 2025, Eberly was diagnosed with breast cancer.

35. Eberly advised Fitzgerald, her boss, about the cancer diagnosis and advised him she would need to take time off from work for treatment and doctor's appointments.

36. Fitzgerald told Eberly that PDS was too small for FMLA leave, and instead, PDS offered something comparable, but that Eberly should not report her condition to Human Resources.

37. Fitzgerald advised Eberly that she should not request leave from work for treatment and doctor's appointments and instead she should go to appointments during the work day without taking any formal leave.

38. In late August 2025, Fitzgerald had a meeting with Palmer, the former owner of PDS; shortly thereafter, Palmer advised Eberly that Fitzgerald told her that Eberly was experiencing some significant medical challenges.

### ***PDS Demotes and Then Terminates Eberly***

39. On August 16, 2025, Executive Vice President Fitzgerald demoted Eberly and informed her that she would no longer retain any managerial responsibilities in her role as Director of Sales of the Male Sales Team Members.

40. When Eberly was demoted, Fitzgerald told Eberly that her duties were to exclusively focus on United States and Caribbean HCM enterprise sales opportunities.

41. After Univerus's acquisition of PDS, effective August 16, 2025, Fitzgerald unilaterally reassigned responsibility for all Univerus-related sales opportunities, including HCM and, eventually Univerus Financials, from Eberly to Price.

42. The decision to take the Universus account responsibility away from Eberly was made despite the fact that Eberly had prior experience in selling financial software solutions comparable to the Universus platform, and unlike Price, Eberly has a Bachelor of Science degree in Accounting.

43. As directed, Eberly then focused her efforts on United States and Caribbean HCM enterprise sales opportunities.

44. On January 22, 2026, Eberly received a Microsoft Teams telephone call from Executive Vice President Fitzgerald and Wendy Hendrick of Human Resources; Fitzgerald told Eberly that she was terminated effective immediately.

45.     Fitzgerald stated that Eberly's position was eliminated in order to align the sales team expenses with revenue.

46.     At the same time that Eberly was terminated, there were only two other employees who were terminated, both of whom are females, Kathi Peboske, Director Customer Success; and Claudia Kuneck, Sr. Sales Development Representative, the only other female on the sales team.

47.     None of the Male Sales Team Members were terminated, all remain employed, including Price.

48.     PDS's termination of Eberly reflects a pattern and practice of PDS treating male employees more favorably than similarly situated female employees.

49.     PDS's decision to terminate Eberly was also based upon PDS's perceptions about Eberly as a disabled employee who required time off from work for treatment and doctor's appointments.

50.     As a consequence of PDS's unlawful conduct, Eberly has suffered significant financial losses and substantial pain and suffering.

### *Unpaid Commissions*

51.     Throughout Eberly's employment Eberly was paid commissions on her sales as a Regional Sales Manager ("RSM") pursuant to the PDS Incentive Compensation Plan.

52.     Eberly was last paid commissions under an "Incentive Compensation Plan effective 9/1/24" (*See* Exhibit "A" ) (hereinafter, "Incentive Compensation Plan").[1]

---

[1] Exhibit "A is the mark-up of the final version of the Incentive Compensation Plan, effective, September 1, 2024; Eberly does not have a copy of the accepted changes which is in PDS's possession.

53. The section titled, Components, on page 4 of Incentive Compensation Plan provides:

> The total compensation paid to Regional Sales Managers (RSMs) and HCM Sales Specialists is comprised of a base salary and this Incentive Compensation Plan (ICP). Any portion of this ICP is subject to adjustment by the Chief Executive Officer. This Plan may be adjusted to compensate for changes in support or marketing emphasis, or other business conditions. **Any such adjustments will be made with 30 days advance notice to the RSMs** and /or HCM Sales Specialists, as the case may be. (emphasis added)
>
> The following policies are established to govern the payment of commissions for -
> - Software Licenses (excluding Population Code increases)
> - Consulting Services (SERVICES)
> - Cloud License
> - Cloud Subscription Agreements
> - Vista Time Subscriptions
> - Vista Protect Amendments
> - Third-Party Products (THIRD-PARTY ROYALTY FEES)
> - Reseller Sales
> - Referral for Private Labels and Service Bureaus

54. PDS did not provide Eberly any notification of changes to the Incentive Compensation Plan from September 1, 2024 to January 22, 2026.

55. The section titled, Cloud Subscription Sales on page 8 of the Incentive Compensation Plan provides:

> The Employee Count from Addendum A will be used to calculate the Cloud Subscription Initial Term Revenue (Employee Count * PEPM * Addendum A term months).

56. The revenue from each sale is cumulative in order to determine the commission percentage rate paid to an RSM.

57. The section titled, Regional Sales Managers - Cloud Subscription Commission Tiers, on page 6 of the Incentive Compensation Plan, provides the commission percentage rates for the calculation of sales commissions by RSMs:

| Commission Rate Level | Sales of | To Sales of | Commission Rate |
|---|---|---|---|
| 1 | $1 | $300,000 | 4.9% |
| 2 | $300,001 | $500,000 | 5.7% |
| 3 | $500,001 | $700,000 | 6.1% |
| 4 | $700,001 | $1,000,000 | 6.5% |
| 5 | $1,000,001 | $1,200,000 | 6.9% |
| 6 | $1,2000,01[2] | $1,500,000 | 7.3% |
| 7 | $1,500,001 | --- | 7.7% |

58. PDS sells Cloud Subscriptions for a minimum term of 36 months and a maximum term of 60 months.

59. The section titled, Cloud Subscription Sales, on Page 8 of the Incentive Compensation Plan, provides that commissions are paid as follows:

> The Employee Count from Addendum A will be used to calculate the Cloud Subscription Initial Term Revenue (Employee Count * PEPM * Addendum A term months). Commissions are calculated based on the applicable Cloud Subscription Commission Tier times the Cloud Subscription Initial Term Revenue. The Annual Accumulator is calculated at forty percent (40%) of the Cloud Subscription Initial Term Revenue. In the event the Addendum A term in the Cloud Subscription Agreement is less than 36 months, the commission and calculation of the Annual Accumulator will be calculated on each successive renewal not to exceed 36 months at the time of renewal.
>
> Commissions will be payable, as they are now for Licenses in the pay period following receipt of the Subscription fees from the Subscriber as follows:
> - Upon receipt of the second monthly billing you will be paid 50% of the total commission calculated.
> - Upon receipt of the third monthly billing you will be paid 30% of the total commission calculated.
> - Upon receipt of the sixth monthly billing you will be paid the remaining 20% of the total commission calculated.

---

[2] $1,2000,01 is a typographical error and should read, "$1,200,001."

9

60. During Eberly's employment she secured contracts, prior to the sale of PDS, for public sector clients; County of Centre Pennsylvania, and City of Jacksonville, North Carolina, among others, and she was always paid a commission based upon a 36 month term, even though those accounts had a termination for convenience clause.

61. When Eberly was terminated, she was advised that the outstanding commissions for the accounts for (a) Town of Palm Beach, Florida; (b) Town of Front Royal Virginia; and (c) City of Cookeville, Tennessee; would only be paid based on a term of 12 months as they had termination for convenience clauses.

62. During Eberly's employment PDS always paid public sector account commissions based upon 36 months, or if the term is longer, the length of the contract term (60 month maximum).

63. The Incentive Compensation Plan does not provide that public sector accounts with a termination for convenience term are only paid based on 12 months, rather than the contract's term.

64. As of the date Eberly was terminated she had not been paid a commission for the National Housing Development Trust contact that she sold.

65. The National Housing Development Trust contract has a 60 month contract term.

66. National Housing Development Trust is not a public sector account and does not have a termination of convenience clause

67. When Eberly was terminated, she was advised that the outstanding commission for the National Housing Development Trust account would only be paid on a term of 12 months.

68. The section titled, Termination on page 11 of the Incentive Compensation Plan provides that if a RSM is terminated, commissions will be paid based upon the cash received from invoices issued on or before the last day of employment.

69. PDS received the cash from invoices for the first year of the contract for each of the following accounts: Town of Palm Beach, Florida; Town of Front Royal, Virginia; City of Cookville, Tennessee; and National Housing Development Trust.

70. PDS has failed to pay Eberly a total of approximately $41,102.28 in commissions ("the Unpaid Commissions") as follows:

    a. Town of Palm Beach, Florida: $12,241.44

    b. Town of Front Royal. Virginia: $8,850.40

    c. City of Cookville, Tennessee: $16,045.64

    d. National Housing Development Trust: $3,964.80

71. Eberly has demanded that PDS pay her the Unpaid Commissions.

72. PDS has refused to pay Eberly the Unpaid Commissions.

## COUNT I

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### 42 U.S.C. §2000(E), et seq., as amended

### SEX DISCRIMINATION

73. Paragraphs 1 through 72 are incorporated herein by reference as though set forth in full.

74. As a female, Eberly is a member of a protected class under Title VII.

75. Eberly was treated less favorably than similarly situated male employees.

76. In terminating Eberly's employment, and continuing to employ the Male Sales Team Members, whose sales were substantially lower than Eberly's sales, PDS has discriminated against Eberly on the basis of her sex.

77. Following Eberly's termination, male employees assumed Eberly's duties.

78. PDS's actions towards Eberly and the decision to terminate Eberly's employment were arbitrary and capricious, and based upon a discriminatory animus towards Eberly in that she was disparately treated because she is a female.

79. PDS's actions constitute a violation of Title VII.

80. As a direct result of the aforesaid unlawful discrimination, Eberly has sustained substantial damages, including a loss of earnings and emotional distress

WHEREFORE, Plaintiff Jeanne Eberly requests that this Court enter judgment in her favor and against Defendant PDS Merger Sub, Inc., doing business as PDS and Personnel Data Systems, and that this Court award Plaintiff all damages available under Title VII of the Civil Rights Act of 1964. 42 U.S.C. §2000(e), in the form of all compensation and monetary losses, which she has been denied, including back pay, front pay, pre-judgment interest; reinstatement, compensatory damages, punitive damages; reasonable attorneys' fees, expert witness fees, costs, and any other relief which the court deems appropriate.

## COUNT II

### VIOLATION OF AMERICANS WITH DISABILITIES ACT, AS AMENDED BY THE ADA AMENDMENTS ACT OF 2008
### 42 U. S. C. §12101, et. seq.

### DISABILITY DISCRIMINATION

81. Paragraphs 1 to 80 are incorporated herein as if set forth in full.

82. Eberly has/had a disability in the form of a physical impairment that substantially limits/limited one or more major life activities as compared to the average person or most people in the general population.

83. As a consequence of the cancer and ongoing need for cancer-related treatment, Eberly is impacted in major life activities.

84. Eberly's disability impacted her ability to work at certain times.

85. Eberly was qualified to perform her job duties throughout her employment.

86. Eberly has a record of an impairment.

87. PDS also regarded Eberly as disabled.

88. Eberly suffered an adverse employment decision in the form of the demotion and eventual termination of her employment.

89. PDS has discriminated against Eberly based upon her disability and PDS's perception that she is disabled.

90. In terminating Eberly, PDS treated Eberly differently than other similarly situated individuals who are not disabled, or whom PDS did not regard as disabled.

91. As a direct result of the aforesaid unlawful discrimination, Eberly has sustained substantial damages, including a loss of earnings and emotional distress.

WHEREFORE, Plaintiff Jeanne Eberly requests that this Court enter judgment in her favor and against Defendant PDS Merger Sub, Inc., doing business as PDS and Personnel Data Systems, and that this Court award Plaintiff all damages available under the Americans with Disabilities Act, as amended, including monetary damages exceeding $150,000.00, compensatory damages, punitive damages, reasonable attorneys' fees, reasonable expert witness fees, interest, costs, and any other relief which the Court deems appropriate.

## COUNT III

## BREACH OF CONTRACT

92. Paragraphs 1 through 91 are incorporated herein as though set forth in full.

93. Eberly and PDS entered into the Incentive Compensation Plan, which constitutes a legally binding contract.

94. Eberly relied upon the terms of contract in performing her work duties during the course of her employment.

95. PDS has breached the contract by not paying Eberly commissions that she earned under the terms of the Incentive Compensation Plan.

96. Eberly has sustained damages as a result of PDS's breach of contract.

WHEREFORE, Plaintiff Jeanne Eberly requests that this Court enter judgment in her favor and against Defendant PDS Merger Sub, Inc., doing business as PDS and Personnel Data Systems, in the amount of approximately $41,102.28; plus interest; costs; and such other relief that this Court deems appropriate.

## COUNT IV

**ACTION PURSUANT TO PENNSYLVANIA WAGE PAYMENT AND COLLECTION LAW, 43 PA C. S. §260.1**

97. Paragraphs 1 through 96 are incorporated herein as though set forth in full.

98. Eberly is an Employee as defined by the WPCL.

99. PDS is an Employer as defined by the WPCL.

100. Eberly provided services to PDS in exchange for wages in the form of a salary plus commissions due under the Commission Agreement.

101. Commissions earned under the Incentive Compensation Plan constitute Wages under the WPCL.

102. Eberly and PDS manifested an intention to be bound by the terms of the Incentive Compensation Plan.

103. The terms of the Incentive Compensation Plan are sufficiently defined.

104. PDS has willfully failed to pay Eberly Wages within the time limits prescribed by the WPCL.

105. Eberly has been damaged as result of PDS's failure to pay Wages due.

106. PDS has failed to pay Wages due for a period in excess of thirty (30) days beyond regularly scheduled paydays.

WHEREFORE, Plaintiff Jeanne Eberly requests that this Court enter judgment in her favor and against Defendant PDS Merger Sub, Inc., doing business as PDS and Personnel Data Systems for violating the Pennsylvania Wage Payment and Collection Law; and enter judgment in Plaintiff's favor against Defendant for all Wages that Plaintiff should have received in the approximate amount of $41,102.28 but for Defendant's violations; liquidated damages in an amount equal to an additional 25% of the total amount of Wages due; reasonable attorneys' fees; expert witness fees; interest; costs; and any other relief, which the Court deems appropriate.

/S/ Andrew S. Abramson, Esq.
_____
Andrew S. Abramson, Esq.
Abramson Employment Law, LLC
790 Penllyn Pike
Suite 205
Blue Bell, PA 19422
telephone: 267-470-4742
email: asa@aemploylaw.com

Attorney for Plaintiff Jeanne Eberly

Dated: March 4, 2026